UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | CRIMINAL NO. 3:07-CR-0196-b-B (02) |
| JASON TROWBRIDGE | § § § | |
| Defendant. | § | |

## MEMORANDUM ORDER

On November 15, 2007, the Court held a hearing on Defendant Jason R. Trowbridge's Motion to Suppress and Memorandum in Support (doc. 58). For the reasons stated on the record and in this Order, the Court **DENIES** the motion to suppress.[1]

### I. BACKGROUND

On January 24, 2007, FBI Special Agents Lynd and Sabol attempted to conduct a "knock and talk" at Jason Trowbridge's ("Trowbridge") Houston, Texas home to obtain information about Guadalupe Martinez ("Martinez"), a suspect who had recently been arrested.[2] The agents were also investigating a conspiracy involving Martinez, Trowbridge, Chad Ward ("Ward"), and Stuart Rosoff in which these individuals allegedly "exceeded authorized computer access to a commercial database

---

[1] As an aside, the Court enters this Order for the sole purpose of memorializing its reasons for denying the motion to suppress and not to suggest the Defendant has a right to appeal the ruling. By his guilty plea, the Defendant has waived his right to appeal the denial of his motion to suppress. *See United States v. Coil*, 442 F.3d 912, 914-915 (5th Cir. 2006) (holding that the defendant waived the right to appeal a denial of his motion to suppress by entering an unconditional guilty plea).

[2] Unless otherwise noted, the Court takes its facts from the evidence presented at the hearing on the motion to suppress. Angela Roberson, FBI Special Agents Allyn Lynd, and Mark Sabol testified at this hearing.

1

to obtain personal identification information on individuals on telephone partylines, so that the conspirators could harass them by making threatening phone calls, disrupting telephone service and making false 911 calls to elicit response by police, fire and ambulance to residences." (Gov't's Resp. to Mot. to Suppress ¶ 1). In the world of cyber-crime, this activity is known as "swatting." (*Id.*). Agent Lynd testified that there was some urgency to their "knock and talk" with Trowbridge because Martinez had been arrested in the presence of another party line member who told others about his arrest. After traveling to two locations, the agents discovered that they had incorrect information about where Trowbridge lived. At around noon, the agents proceeded to Ward's home and interviewed him. Ward confirmed Trowbridge's address and stated that Trowbridge had a girlfriend who lived with him, that Trowbridge had instructed him to destroy evidence on one occasion, that Trowbridge had seven computers in his home, and that Trowbridge was anti-government and could take care of himself if law enforcement arrived. He also told the agents that Trowbridge had access to a commercial database in his business but did not state whether this database was used at Trowbridge's residence.

The agents proceeded to Trowbridge's town home at about 3:00 p.m to perform their "knock and talk." At this time, they believed that they did not have probable cause to search Trowbridge's residence. The agents observed a car that they believed to be associated with Trowbridge and saw a business card with his name on it inside the car. When the agents knocked on Trowbridge's door, identified themselves, and called out Trowbridge's name, the music inside the home stopped playing. Agent Sabol noticed a cell phone on the balcony and went to the back of the building where he observed two individuals, who did not fit Trowbridge's description, exit the residence and jump over an eight to ten foot fence. When Sabol returned to the front of the home, the cell phone he had

2

previously observed was no longer on the balcony causing him to believe that there might be someone inside the home. Angela Roberson ("Roberson"), Trowbridge's girlfriend who lived with him, eventually answered the door and told the agents that Trowbridge was not home. She agreed to talk to the agents about Martinez and allowed them to come inside. The agents remained on the first floor of the three level town house during this interview. During the course of the interview, Roberson told the agents that she had exchanged instant messages with Martinez regarding his swatting activities on various computers in the home, that spoof cards had been purchased using computers in the home, and that Trowbridge had computer access to a commercial database at the home. The agents also smelled marijuana and observed drug paraphernalia. Officer Lynd observed a wireless router that he explained would allow a person within a few hundred yards to access the computers and erase or change them. Officer Lynd testified that if he had access to the computers he could determine whether the allegedly criminal phone calls had been made using spoof cards purchased on Trowbridge's computers. During the interview, the officers noticed three computers downstairs, and Roberson said that there were three upstairs. At the agents' request, Roberson called Trowbridge's cell phone, and the agents heard the phone ring upstairs. Roberson hung up the phone stating that Trowbridge did not answer. At this point, the agents believed that Trowbridge was hiding upstairs but did not know how many people were upstairs, if there were any weapons, or if the individuals who had fled would be returning. Agent Lynd then called and spoke with Trowbridge who said he was not home and that Lynd could make an appointment to speak with him and his attorney. Agent Sabol testified that the design of the multiple level town house would allow someone from upstairs to approach the agents without being discovered.

At some point during the conversation with Roberson, the agents developed probable cause

3

to search the computer hard drives because she identified the computers as being used to have conversations with Martinez and to purchase spoof cards. The agents then spoke with the U.S. Attorney's Offices in Dallas and Houston and determined that exigent circumstances existed to seize the computers. The U.S. Attorney's Office advised them that it would be difficult to get a search warrant in the late afternoon around 4:30 because of Houston traffic. Agent Lynd testified that in his experience individuals involved in computer crimes had attempted to destroy computer evidence and that Martinez had given a computer away to prevent the agents from obtaining evidence. He also testified that computer evidence is more fragile than drug evidence. It can be destroyed by turning off the computer, smashing it with a hammer, using a magnet, or throwing it into a fire. He stated that software is available to destroy evidence on a computer and that a hard drive is easy to remove and hide. Lynd said that he was sure the evidence would be gone in a few minutes if the agents left. Both agents testified that they did not believe it would be safe to leave one agent at the residence while the other secured a search warrant. Officer Lynd based this fear on the fact that Roberson and Trowbridge were concealing Trowbridge's presence upstairs, people had fled the residence, the residence smelled like marijuana, and they could not see what was occurring upstairs. Agent Sabol also knew Trowbridge had been affiliated with an anarchist group. Lynd testified that he was concerned that Ward had called Trowbridge to warn him that the agents were coming.

The agents asked Roberson for a copy of the computers and when she refused informed her that they would seize the computers to prevent the destruction of evidence. At this point Roberson for the first time asked the agents to leave. Trowbridge and Trowbridge's attorney also spoke with the agents on the phone. When Houston police department officers arrived to perform a safety sweep, Roberson told them that Trowbridge was upstairs. The police officers escorted him

4

downstairs. Then additional agents arrived and seized the computers. Trowbridge's attorney also arrived. The agents checked the computers into the evidence control room in Houston, obtained a search warrant, shipped the computers to the Dallas evidence control room, and then delivered them to the North Texas forensic lab. The agents seized only the computers and did not search anything else in the home. They also left two inventories of what was taken from the home.

On June 19, 2007, a grand jury charged Trowbridge with "Conspiracy to Use Access Devices to Modify Telecommunications Instruments and to Access Protected Telecommunications Computers (Violation of 18 U.S.C. § 371 (18 U.S.C. §§ 1029(a)(9) and 1030(a)(5)(A)(ii)))" (doc. 1). Trowbridge moved to suppress all evidence obtained as a result of the January 24, 2007 search of his residence because the search violated (1) his right to be free from unlawful searches and seizures under the fourth Amendment; (2) his right to due process of law under the Fifth Amendment; and (3) his right to the effective assistance of counsel under the Sixth Amendment.

## II. Analysis

**A.    Fourth Amendment Search and Seizure**

*1.    Was there an exigency?*

"A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment." *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001). The government bears the burden of proving that an exigency exists. *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995). "Whether exigent circumstances exist is a question of fact, reversible only if the district court's factual findings are clearly erroneous. We look to the totality of the circumstances surrounding the officers' actions,

mindful that our review is 'more akin to examining a video tape by instant replay than to examining a snapshot. *United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997) (quoting *Rico*, 51 F.3d at 501). Exigent circumstances include: 1) reasonable fear for officer's safety; (2) presence of firearms; (3) risk of a criminal suspect escaping; or (4) fear of destruction of evidence. *Rico*, 51 F.3d at 501. The Court will consider the following factors to determine whether an exigency exists: "(1) the degree of urgency involved and amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001).

In *Howard*, the Fifth Circuit held that an exigency existed when (1) the agent had probable cause to believe that drugs were in the home; (2) the officer was concerned for his own safety, that of the other officers, and that of the community; (3) there was a fast-moving investigation and the defendant was waiting for an individual who had been arrested to return with drugs; (4) a crowd had gathered around the home and the officer was unaware if other people were in the home; and (5) the officer had reason to believe that the evidence might be removed or destroyed inside the home. 106 F.3d at 74. In *Riley*, the police arrested an individual who informed them that the house that he was seen leaving contained a large amount of money, a gun, and another person. *United States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992). The officers then forced open the door, performed a protective sweep of the home, and detained the defendant. *Id.* at 424. In determining whether an

6

exigency justified the entry into the home, the Court found it significant that the arrested individual was carrying a cell phone. *Id.* at 425. This indicated that the individual was supposed to report back to the home and that failure to do so may alert the occupant of the home that something had happened. *Id.* The entry was also justified by the need to preserve the evidence of drugs that could be lost or destroyed if the search was delayed. *Id.*

Applying the first factor from *Jones* to the present case, the degree of urgency and the time required to obtain a warrant, the situation was urgent because the officers believed that Trowbridge was upstairs and could quickly destroy the evidence. Lynd testified that he was sure that the evidence would be gone in a few minutes. The agents also testified that they feared for their safety. With respect to the time it would take to obtain a warrant, the U.S. Attorney's Office told the agents that due to afternoon traffic, it would be difficult to obtain a search warrant that day. As for the second factor, the reasonable belief that contraband will be removed, the officers believed that Trowbridge was hiding upstairs and had access to the computers. They had also been told that Trowbridge had instructed Ward to destroy evidence in the past. The next factor for the Court to consider is whether it would be dangerous for police officers to guard the site while a search warrant is sought. Both officers credibly testified that they did not believe it would be safe to leave one agent at the residence while the other secured a warrant. Agent Sabol testified about his concern regarding the layout of the town house. He stated that it would be easy for someone to approach the officers without being detected. The officers believed that Roberson and Trowbridge were deceiving them by concealing Trowbridge's presence in the home. Agent Sabol had seen two individuals fleeing the house and was unaware whether they might return or whether there were other individuals or weapons in the home. Ward also told the agents that Trowbridge was anti-government and could

7

take care of himself if law enforcement arrived. The smell of marijuana and the knowledge that Trowbridge was allegedly affiliated with an anarchist group also alarmed the agents. These facts support a finding that it would have been dangerous for one of the officers to guard the residence.

Considering the fourth factor, an indication that the possessors are aware that the police are approaching, Lynd testified that Martinez had recently been arrested and news of this arrest may have been available to party line members. As in *Riley*, the agents had spoken with Ward, another suspect. They were concerned that he would call Trowbridge to warn him that they were coming. When Roberson called Trowbridge's cell phone, the officers heard the phone ring upstairs. This indicated to the officers that Trowbridge was upstairs and was aware of their presence. The presence of a car that they associated with Trowbridge and the disappearance of the cell phone from the balcony also indicated that Trowbridge might be in the home. In addition, the agents had spoken with Trowbridge on the phone confirming that he knew of their presence. Finally, the Court will consider "the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic. " Officer Lynd testified that computer evidence is easier to destroy than drug evidence. Trowbridge argued that even if electronic data may be easily destroyed, one may not assume that the suspect has the means, knowledge, or wherewithal to destroy it. (Def.'s Reply 2). However, the Court found that based on the agents' testimony, there was reason to believe that Trowbridge would destroy the evidence. Ward informed the officers that Trowbridge had instructed him to destroy evidence in the past; therefore, the destruction of computer evidence may be characteristic of his behavior. While this was not a narcotics case, Agent Lynd testified that individuals accused of computer crimes had attempted to destroy evidence in his experience and that Martinez had disposed of computer

8

evidence. In conclusion, the Government has presented sufficient facts to support each *Jones* factor.

This case is similar to *Howard* in that the agents developed probable cause to believe that evidence would be found on the hard drive based on Roberson's statements. The agents were concerned for their safety and were involved in a fast-moving investigation. As in *Howard* and *Riley*, the agents needed to enter the home to prevent the destruction of evidence. This Court determined based on the agents' credible testimony and the totality of the circumstances that an exigency existed because of the likelihood that the computer evidence would be destroyed. The Court will now consider whether the agents manufactured the exigent circumstances.

*2. Did the agents manufacture the exigency?*

After determining that an exigency existed, the Court must determine whether the police created the exigency. *Howard*, 106 F.3d at 78. "Exigent circumstances may not consist of the likely consequences of the government's own actions or inactions. In determining whether officers create an exigency, this Court focuses on the 'reasonableness of the officers investigative tactics leading up to the warrantless entry.'" *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007) (quoting *Jones*, 239 F.3d at 720).

In *Jones*, the officer had obtained some evidence that drug activity was occurring in an apartment home but did not believe that he had probable cause to obtain a search warrant. 239 F.3d at 718-19. He knocked on the door to identify the occupants and further investigate. *Id.* at 719. The front door to the apartment was opened, but the screen door was closed. *Id.* When the officers knocked and announced, they noticed a handgun in plain view on the kitchen table near Jones and another individual sitting on a couch. *Id.* When Jones unlocked the screen door and began talking to the officers, an officer entered the apartment to secure the handgun. *Id.* After determining that

there was an exigency for the officer to enter the home, the Court considered whether the exigency was manufactured by the officers. *Id.* at 720. The Court reasoned that the "knock and talk" strategy is "a reasonable investigative tool when officers seek to gain an occupant's consent to search or the officers reasonably believe criminal activity." Id. The police did not create the exigency because they did not observe criminal activity before approaching the residence that would nullify the purpose of the knock and talk. *Id.* at 721. The Court contrasted *Munoz-Guerra*, 788 F.2d 295 (5th Cir. 1986), in which before knocking on the door, the officers were certain that criminal activity had taken place because they observed drugs through the window. *Id.* The Court stated, "Because the officers were not convinced that criminal activity was taking place . . .the 'knock and talk' was a reasonable investigative tactic under the circumstances." *Id.* The Court also explained that Jones, not the officers, created the exigency by leaving the door opened and a handgun in plain view. *Id.* at 721-22.

In this case, the Court is convinced that like the officer in *Jones*, the agents did not have probable cause to search Trowbridge's computers because there was no evidence connecting his computers to the offense they were investigating. (Gov't's Resp. to Mot. to Suppress 18). Accordingly, it was reasonable for the officers to use the "knock and talk" strategy to further investigate. In addition, Trowbridge and Roberson, not the officers, created the exigency when they attempted to deceive the agents by claiming that Trowbridge was not at home. Based on the agents's testimony, the Court concluded that their investigative tactics were reasonable and did not create the exigency.

**B.    Fifth and Sixth Amendments**

The Fifth Amendment prohibits "admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 295 (1990) (citing *Miranda*

*v. Arizona*, 384 U.S. 436, 444 (1966)). Custodial interrogation is defined as "'questioning initiated by law enforcement officers after a person has been taken into custody.'" *Id.* (quoting *Miranda*, 384 U.S. at 444). An individual is in custody if he or she is (1) formally arrested or (2) "'when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest.'" *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005). An individual's Fifth Amendment right against self-incrimination is not implicated absent custodial interrogation. *Id.*

The Sixth Amendment right to counsel attaches "'at or after the initiation of adversary judicial proceedings against the defendant.'" *Stryon v. Johnson*, 262 F.3d 438, 447 (5th Cir. 2001) (quoting *United States v. Gouveia*, 467 U.S. 180, 187 (1984)); *see also Kirby v. Illinois*, 406 U.S. 682, 689 (1972) ("[W]hile members of the Court have differed as to the existence of the right to counsel in the contexts of some of the above cases, all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.").

Neither the Fifth nor Sixth Amendment rights are implicated in the case at hand. Roberson voluntarily spoke with the agents; she had not been formally arrested, was not in custody, and adversary judicial proceedings had not been initiated against her. During the hearing Roberson admitted that she knew that she was not under arrest, that the agents spoke in a normal tone of voice, and that she did not ask them to leave until after they informed her they would seize the computers. Agent Lynd testified that Roberson said it would be fine if they went inside and spoke with her, that she was not reluctant to provide information, and that she was a "talker." While Roberson stated that she was afraid she would be in trouble with the FBI if she left, the Court found

that the other testimony outweighed this statement. Accordingly Roberson was not in custody for Fifth Amendment purposes.[3] Similarly, Trowbridge was not in custody and any statements over the phone and during the seizure of the computers were voluntary. (Supplemental Resp. of Gov't to Mot. to Suppress 5). In conclusion, the Fifth and Sixth Amendments do not justify the suppression of evidence because they do not apply to Roberson and Trowbridge who were not in custody and had not had adversary judicial proceedings initiated against them.

### III.  CONCLUSION

Because the Government established an exigency that justified a warrantless seizure of Trowbridge's computers, the Court **DENIES** Trowbridge's motion to suppress.

**SO ORDERED.**

**SIGNED November 29th, 2007**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

[3]Even if Roberson was in custody for purposes of the Fifth Amendment, Trowbridge could not assert Roberson's Fifth Amendment privilege because the Fifth Amendment is a personal right. *Bryson v. United States*, 419 F.2d 695, 699 (D.C. Cir. 1969).